

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

SEP 17 2003
$ 150 Pd
LAWRENCE K. BAERMAN, CLERK
ALBANY

Summons Iss'd.
(WL)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Joseph Smith,

         Plaintiff,

  v.

City of Utica; Utica Police Department;
Jennifer Asker; Nicholas LaBella;
Phillip Taurisano; Gerald Azzarito;
Fred Bruzzese; C. Allen Pylman;
John Doe, a fictitious name for FNU/LNU,
unknown members of the Utica Police
Department; Richard Roe, a fictitious name
for FNU/LNU, unknown supervisors
of the Utica Police Department;
Michael Arcuri, District Attorney of
Oneida County; and the County of Oneida

         Defendants

Civil Action
No.
5:03-CV-1146

DNH / DEP

**Complaint**
**Demand for Jury Trial**

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

1. Plaintiff, Joseph Smith brings this action concerning the deprivation of his due process rights against individual police officers of the City of Utica, police supervisors of the City of Utica, the individual District Attorney of Oneida County and the County of Oneida. The action is one for damages arising out of the failure of the police officers to provide exculpatory materials to the District Attorney and the officers' deliberate indifference to their duties, the failure and deliberate indifference of the Utica Police Department through its supervisors and policy makers to train and supervise its officers in the proper handling of exculpatory materials, and the failure and deliberate indifference of the Oneida County District Attorney, individually and as a policy maker for the County, to train and supervise law enforcement personnel concerning their obligations to furnish his office with exculpatory materials.

### Jurisdiction and Venue

2. Plaintiff brings this action against defendants to redress the deprivation of rights secured him by the Fifth and Fourteenth Amendments of the United States Constitution and Title 42, United States Code, Section 1983.

Police Department and was the lead investigator in the criminal investigation leading to this action from February, 2001 to the present. Defendants LaBella, Taurisano, Azzarito and Bruzzese were investigators with the Utica Police Department during the course of events giving rise to this action. Defendant John Doe is a fictitious name for First Name Unknown/ Last Name Unknown (FNU/LNU) Utica Police officers who unlawfully violated plaintiff's rights. Defendant Richard Roe is a fictitious name for First Name Unknown/ Last Name Unknown (FNU/LNU) Utica Police Department supervisors who supervised the officers who unlawfully violated plaintiff's rights. Defendant C. Allen Pylman is the Chief of Police of the Utica Police Department and is one of its senior policy making officials, if not its chief policy making official. Defendant Pylman was the Chief at the time the plaintiff's rights were violated. The defendants are sued individually and in their official capacities.

9. Defendant Michael Arcuri is the District Attorney of the County of Oneida, and as such is a policy making official for the Defendant County of Oneida. The Oneida County District Attorney's Office has the responsibility and authority to prosecute all felony criminal violations occurring within the County, which includes the City of Utica. The District Attorney is also responsible for seeing to it that law enforcement officers working with his office in connection with criminal prosecutions have the training and knowledge concerning the officers' responsibilities to provide

4

exculpatory information relating to cases being prosecuted to the District Attorney's Office.

11. At the time of the events giving rise to this claim, the defendants acted under color of law.

## Facts

12. Upon information and belief, in late February, 2000 a young woman named Desiree Case was found murdered at or near the second floor of an abandoned house at 1425 Francis Street in the City of Utica, New York. Members of the Utica Police Department immediately began an investigation into the homicide. Ms. Case was known to members of the Utica Police Department to be a prostitute and a user of controlled substances, including cocaine base (commonly known as "crack").

13. Upon information and belief, the Utica Police Department also worked with investigators and prosecutors from the Oneida County District Attorney's Office, including the District Attorney during the course of the investigation.

14. Upon information and belief, the investigators involved in the case interviewed a number of individuals who advised them that Desiree Case had been murdered by Earl Wright and Michael Nero (both individuals known by various street names) at the behest of an individual known as "Capone" because Capone and his associates suspected Ms. Case of having stolen crack from their narcotics business in Utica. The investigators also learned that the plaintiff, who was a corrections

officer for the Madison County, New York Sheriff's Department at the time of the murder, was a close friend of Ms. Case.

15. Upon information and belief, after little progress had been made in the investigation over a lengthy period of time, Ms. Case's mother began to make public complaints about the lack of interest and progress on the part of the authorities in the City of Utica in solving the homicide. Upon information and belief, the Mayor of the City of Utica began pressuring the Police Department to make an arrest in the case. Then, on November 28, 2001, the Oneida County District Attorney's Office sought and obtained a Grand Jury indictment charging the plaintiff with two counts of Murder in the Second Degree in violation of Article 125 of the Penal Law of the State of New York. The plaintiff was arrested and incarcerated on that same date.

16.. The plaintiff was subsequently arraigned in Oneida County Court and on December 6, 2001, by his attorney, sent a demand to the District Attorney of Oneida County requesting that the attorney be provided with all exculpatory or impeachment materials. A prosecutor has an obligation to seek such materials (commonly known as <u>Brady</u> and <u>Giglio</u> materials) from the investigators' and prosecutors' files in order to protect the rights of defendants in the course of hearings and trials pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 6 of the New

York State Constitution. On or about December 21, 2001, the Oneida County District Attorney responded to the demand for these materials by stating:

> "...(T)he People are not in possession of any exculpatory <u>Brady</u> material which could reasonably be expected to weaken or affect any evidence proposed to be introduced against the defendant or which would in any manner aide the defendant in the preparation of an adequate and proper defense. The People recognize their continuing obligation under the <u>Brady</u> rule to provide counsel for the defendant with any evidence or exculpatory material which may come into its possession. If any such evidence does come into the possession of the People, the same shall be furnished to counsel for the defendant immediately upon the prosecution's receipt of the same."

17. On or about January 2, 2002, plaintiff's counsel made pre-trial motions; including a motion to compel the prosecutor to turn over <u>Brady</u> materials "...(I)n the actual or constructive possession, custody or control of the prosecutor's office or of any law enforcement agency...." This was coupled on the same date with a "demand to produce" these materials. Upon information and belief, on or about January 8, 2002, the Oneida County District Attorney replied by again denying that he was in possession of any such materials and acknowledging his continuing duty to provide such materials if they were ever obtained.

18. On or about January 25, 2002, plaintiff's counsel sent a letter to the District Attorney requesting, among other items: interviews of persons the murder victim had resided with, including an individual named Laurie Seakin; interviews of other suspects; and interviews of friends and associates who may have been with Case during the days prior to her death. The District Attorney replied to this request

7

on or about February 7, 2002 by indicating that Laurie Seakin had not been interviewed, that a list of other suspects and their interviews was being compiled. District Attorney Arcuri ignored the request for reports of interviews of neighbors and associates.

19. Upon information and belief, a list of other suspects was provided to the defense on or about February 15, 2002 which included Earl Wright a/k/a "Pelo" and a Michael LaMont a/k/a Monty (who now is known to be an individual named Michael Nero). A statement by Nero implicating people other than the plaintiff in the homicide was provided as well. The prosecutor also provided some brief interview notes of an individual who indicated she had heard rumors that the victim had been killed at the behest of a drug dealer known as "Capone".

20. The murder trial of plaintiff was commenced in Oneida County Court on March 18, 2002 and concluded with a guilty verdict on one count murder on March 22, 2002. The plaintiff was acquitted of a second count of intentional murder. At the trial, proof was adduced that the plaintiff had told defendant Asker, who at the time was a Lieutenant with the Utica Police Department, that the plaintiff believed that a crack dealer known as "Capone" had murdered Ms. Case, the victim. Asker further testified that "Capone" was the nickname of Anthony Martin and that she had been able to exclude him as a suspect because, among other things, Martin had told Asker that he didn't commit the murder. Defendant Asker's testimony also

8

indicated that Earl Wright a/k/a "Pelo" was a drug dealer for "Capone". During his summation defendant Arcuri ridiculed plaintiff's suggestion to defendant Asker that "Capone" and his crew were responsible for the homicide. At the trial the prosecutors also used a "jailhouse witness", John Terry, who claimed that plaintiff had made admissions to Terry in jail that plaintiff had killed Desiree Case.

21. Upon information and belief, at the very end of the trial, plaintiff's attorney was advised by another attorney that a client of the second attorney had been interviewed by the Utica police in connection with the Case homicide. By the time this the witness's attorney could be talked to in any detail, the plaintiff's trial was over. Upon information and belief, when Laurie <u>Seakan</u> Malozzi, the client of the second attoney, was interviewed in May, 2002, she indicated that she told the Utica Police in March of 2000 that Michael Nero had been responsible for Case's murder at the behest of "Capone", whose real name was Toki, or Coki, Johnson, and that she had given the authorities a written statement. Seaken-Malozzi described "Capone" as having a large scar on his face. Defendant Arcuri did not provided a copy of Seaken-Malozzi's statement to plaintiff's attorney ever, let alone before or during trial.

22. Plaintiff's criminal attorney and his investigator then were able to find another individual who had given statements earlier in the investigation to the Utica Police Department which implicated Nero and Toki Johnson a/k/a "Capone" in the

9

homicide. Kenneth Rabideau, an inmate at the Oneida County Jail in April, 2002 wrote a letter to Defendant Arcuri, and advised an investigator working with plaintiff's criminal defense attorney, that Rabideau had been an inmate at the Oneida County jail on March 21st, 2000, and that another inmate by the name of Mike Nero started speaking to Rabideau about drugs and that Nero mentioned a man by the name of Capone who had a long scar on his face. According to Rabideau Nero said that Nero had killed Desiree Case for Capone because she and stolen $1,000 worth of crack from Capone. Rabideau's letter also stated that he had given this information to defendant Investigator Fred Bruzzese in November, 2000, and that Bruzzese had written the information down. Plaintiff's investigator also ascertained from Rabideau that there were two individuals known as "Capone" - one was Anthony Martin and the other, who was Nero's associate and the person referred to in the interview with defendant Bruzzese, was a male with a long scar on his face whose name was unknown to Rabideau. Rabideau's information was not provided to defense counsel prior to, or even during, plaintiff's trial.

23. Also following the trial, plaintiff's criminal attorney learned of significant impeachment materials concerning the jailhouse witness, John Terry, which were known to the Utica Police, but which were not turned over to defense counsel before or during the trial. On March 25th, 2002, three days after the trial, plaintiff's criminal defense counsel received information from an Oneida County jail inmate by

the name of Brian LaBella who claimed to have information regarding the Case homicide. Defense counsel's investigator spoke with Brian LaBella who indicated that John Terry, the jailhouse witness, had told LaBella on several occasions that Terry knew who killed Desiree Case and that Terry believed that plaintiff Smith was innocent. LaBella described Terry as a con-artist and a liar who was always pulling scams to try to get commissary money from other inmates. LaBella's further indicated that LaBella's cell was right next to plaintiff's cell and that he listened to conversations between plaintiff and Terry and that plaintiff never discussed his case with John Terry much less made any admissions. LaBella also advised counsel's investigator that about one week before the plaintiff's trial was to begin, LaBella was contacted by defendant Nicholas LaBella (no relation), a Utica Police Department investigator, and another officer. According to Brian LaBella, the officers promised him a reduced sentence if he would testify that plaintiff had admitted to killing Desiree Case and encouraged Brian LaBella to try to get plaintiff to make an admission. Brian LaBella told defendant Nicholas LaBella and the other officer that he would not try to obtain statements from plaintiff because he believed that plaintiff was innocent.

24. Upon information and belief, on or about May 30, 2002, plaintiff's attorney made a motion to set the guilty verdict aside based upon the failure to provide <u>Brady</u> materials, including those described above, prior to or during trial. On

11

June 13, 2002, an Oneida County Court Judge ordered a new trial for plaintiff based upon the defendant District Attorney Arcuri's statement to the Court that he had discovered a statement implicating others in the homicide which should have been turned over to the defense prior to trial.  Defendant Arcuri then told the press that the Utica Police had not given him the statement and that had he known of it, he would have delayed the Grand Jury presentation against the plaintiff.

25.  Upon information and belief, during the ensuing weeks, while plaintiff continued to languish in jail, several other statements implicating others were uncovered in Utica Police Department files.  None of these had been provided to the plaintiff or his criminal attorney prior to or during the trial.  Examples of materials existing as of the March trial but not disclosed include, but are not limited to, the following:

a. An individual named Rebecca Poirer indicated that she received a telephone call in October or November of 2001 (about the time the plaintiff was indicted) from Michael Nero, who she described as a good friend.  Poirer said Nero called from a correctional facility and that Nero told her that he and someone named "Pelo" had killed Desiree Case.  Poirer further indicated that either that day or the next day in 2001, she spoke to Investigator Liggins of the Utica Police Department and told him what Michael Nero had told her.

   b. An individual named Demetrious Richardson gave a written statement to defendants Taurisano, Asker and Azzarito on February 8th, 2001 (more than one year before plaintiff's trial) stating that he learned from Earl Wright that from 1999 to 2000, Earl Wright a/k/a Pelo and Michael Nero a/k/a Monte were working for a drug dealer named Capone and that another person by the name of Richie Rosado hung out with them. Richardson heard on the street that Wright and Nero were responsible for Desiree Case's death. In November of 2000 Richardson was incarcerated in the same cell block as Wright, and that one night Wright came back from a visit and said that he had been questioned about the Desiree Case homicide and said that he had taken a lie detector test. Wright then admitted to Richardson that Wright had killed Desiree Case with Nero's assistance.

   c. No reports were ever received concerning any interviews with Wright

  26. Despite these exculpatory and potentially impeaching statements, as well as others that are unknown at this time, defendant Arcuri didn't agree that the plaintiff should be released from custody until August 1, 2002. Finally, on August 28, 2002, the District Attorney asked an Oneida County Court Judge to dismiss the charges against the plaintiff. The Court granted this request in light of the fact that the District Attorney's Office had obtained an indictment of Earl Wright for the murder.

27. Wright and Nero have since pleaded guilty to charges related to the murder of Desiree Case. There is no proof that the plaintiff was ever involved with Wright or Nero in any way.

28. Upon information and belief, in statements to the press and in filed pleadings with Oneida County Court, the defendant Oneida County District Attorney Arcuri has indicated that the Utica Police Department had made a "mistake in judgement" when it failed in its obligation to turn over to him exculpatory statements obtained during the course of the investigation, and, by implication, this failure by the Police Department, caused defendant Arcuri to not live up to his duty to seek out and turn these matters over to the plaintiff and his criminal defense attorney. In fact defendant Arcuri indicated that had he been aware of the exculpatory material, he would have delayed presentation of the case to a Grand Jury.

29. Upon information and belief, defendant Pylman, the Chief of Police for the City of Utica, admitted to the local press that there were training issues at the Police Department that need to be addressed concerning the handling of exculpatory materials.

30. As a proximate result of his being subjected to prosecution and conviction for a murder he did not commit and the more than eight months spent in jail before being exonerated, plaintiff has been humiliated and embarrassed, lost employment,

faces limited prospects for employment in the future, suffers physically and mentally and has had to expend large sums of money to defend himself in Court.

### COUNT ONE: VIOLATION OF CONSTITUTIONAL RIGHTS

Defendants Jennifer Asker, Nicholas LaBella, Phillip Taurisano, Gerald Azzarito, Fred Bruzzese and John Doe

(Claim for Compensatory Damages)

31. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 30.

32. The various materials outlined above, together with other available materials not yet made known to the plaintiff, constituted material exculpatory and impeachment information which would have likely changed the outcome of his trial had they been disclosed in a timely manner.

33. The failure to turn over <u>Brady</u> exculpatory and impeachment materials by these defendants while acting under color of law to the Oneida County District Attorney in a timely fashion deprived the plaintiff of liberty and property without due process of law and deprived him of his right to a fair trial all in violation of the Fifth and Fourteenth Amendments to the United States Constitution, for which the defendant police officers are individually liable.

### COUNT TWO: VIOLATION OF CONSTITUTIONAL RIGHTS

15

Defendants Jennifer Asker, Nicholas LaBella, Phillip Taurisano,
Gerald Azzarito, Fred Bruzzese and John Doe

(Claim for Exemplary Damages)

34. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 33.

35. The failure to turn over exculpatory materials which would have aided the plaintiff in his defense at trial was done intentionally by the individual defendant police officers with actual malice toward plaintiff and with willful and wanton indifference to and deliberate disregard for the constitutional rights of plaintiff. Plaintiff is thus entitled to exemplary damages.

COUNT THREE: VIOLATION OF CONSTITUTIONAL RIGHTS

Defendants Jennifer Asker, Richard Roe, C. Allen Pylman, City of Utica
and the Utica Police Department

(Claim for Compensatory Damages)

36. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 33.

37. The City of Utica and its Police Department through its supervisory officers and its Chief of Police know that its officers in the course of conducting investigations will encounter witnesses and evidence that is contrary to the theory or theories investigators pursue when trying to arrest and prosecute individuals for crimes. The existence of seemingly contrary evidence will present officers with

difficult choices in terms of handling and disclosing evidence that is contrary to what the investigators think the facts are, and the investigators thus have powerful incentives to suppress contrary or exculpatory evidence in the hopes of obtaining an arrest and conviction of the person or persons they believe are responsible for committing crimes. A wrong decision on whether or not a witness statement or piece of evidence constitutes <u>Brady</u> material will always lead to a deprivation of a defendant's due process rights. By the admission of defendant Pylman, the Chief of Police, the training and, by implication, supervision of Utica Police officers was inadequate in the area of the duty of police officers to turn over exculpatory materials to prosecutors. Such inadequate training and supervision constitutes deliberate indifference on the part of the City of Utica, its Police Department, Chief Pylman and Asker and Roe as supervisory personnel to the due process rights of defendants arrested by Utica Police officers.

COUNT FOUR: VIOLATION OF CONSTITUTIONAL RIGHTS

Defendants Michael Arcuri and the County of Oneida

(Claim for Compensatory Damages)

38. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 33, 36 and 37.

39. Defendant Michael Arcuri, as the District Attorney of Oneida County, is the chief policy maker and decision maker on behalf of the County of Oneida in the

area of criminal prosecutions.  As the District Attorney, Defendant Arcuri is the chief law enforcement officer within the County and his office assumes the responsibility of training and supervising police agencies and officers it deals with in the area of providing legal advice in connection with criminal investigations and prosecutions.  Defendant Arcuri knows that he and his Assistant District Attorneys will be faced with statements and evidence in criminal cases which could constitute <u>Brady</u> material and that prosecutors have a duty to seek these materials out from the police officers and departments involved in investigations.  The existence of this material will present the prosecutors with difficult decisions as to whether or not evidence should be disclosed to a defendant as <u>Brady</u> material because it is either exculpatory or constitutes impeachment material, and a District Attorney necessarily knows that police officers who are not adequately trained and supervised may neglect their obligation to apprise prosecutors of the existence of these materials.  The District Attorney would also know that it is important to train personnel in his own office concerning their responsibilities in this area.  A wrong decision on whether or not a witness statement or piece of evidence constitutes <u>Brady</u> material will always lead to a deprivation of a defendant's due process rights.  By getting involved as a legal adviser to the police, and while assuming the mantle of the County's chief law enforcement officer, a District Attorney necessarily is responsible for training and supervising the police with respect to the obligations of the police to turn over all

potential exculpatory and impeachment material to a prosecutor who can then make a decision concerning the need for disclosure to a defendant and defendant's counsel. Statements of defendant Pylman, the Chief of Police of the City of Utica, have indicated that the training, and by implication supervision, of Utica Police officers was inadequate in the area of the duty of police officers to turn over exculpatory materials to prosecutors. Such inadequate training and supervision constitutes deliberate indifference on the part defendant Arcuri individually and as the County of Oneida's chief policy maker in this area to the due process rights of defendants arrested by Utica Police officers.

WHEREFORE, plaintiff requests that this Court enter judgement against the defendants and award the following amounts:

Five million dollars ($5,000,000) compensatory damages;

One million dollars ($1,000,000) exemplary damages;

Costs of this action, including reasonable attorney fees; and

Such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a jury trial.

Dated: September 17, 2003

> Green & Seifter, PLLC
> Attorneys for Plaintiff
>
> _____
> Donald T. Kinsella, Esq.
> NDN Bar Roll No. 103149
> 90 State Street, Suite 1440
> Albany, New York 12207
> Phone: (518) 694-4600
> Direct Fax: (315) 423-2811
> Email: dkinsella@greenseifter.com